## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DONALD A. RALPH,** | : | **CIVIL ACTION NO. 1:14-CV-01230** |
| | : | |
| **Plaintiff** | : | **(Chief Judge Conner)** |
| | : | |
| **vs.** | : | |
| | : | |
| **CAROLYN W. COLVIN, ACTING** | : | |
| **COMMISSIONER OF SOCIAL** | : | |
| **SOCIAL SECURITY,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM

### Background

The above-captioned action seeks review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Donald A. Ralph's claim for social security disability insurance benefits and supplemental security income benefits.[1]

---

[1]Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." It is undisputed that Ralph met the insured status requirements of the Social Security Act through December 31, 2014.

Supplemental security income is a federal income supplement program funded by general tax revenues (not social security taxes). It is designed to help aged, blind or other disabled individuals who have little or no income.

On February 8, 2011, Ralph protectively filed[2] an application for disability insurance benefits and on March 30, 2011, an application for supplemental security income benefits. Tr. 14 and 219-232.[3]   On May 10, 2011, the Bureau of Disability Determination[4] denied Ralph's applications. Tr. 150-161.  On May 11, 2011, Ralph filed a request for a hearing before an administrative law judge. Tr. 14 and 162-163. The request was granted and a hearing was held on September 19, 2012. Tr. 14 and 32-100.  Ralph was represented by counsel at the hearing. Id.

In his application for disability insurance benefits Ralph claimed that he became disabled on November 20, 2009 and in his application for supplemental security income benefits on November 21, 2009. Tr. 14, 219 and 226.  At the administration hearing Ralph amended his alleged disability onset date to August 25, 2010. Tr. 14, 43, 47-48 and 50.  Ralph alleged that he was disabled from performing any full-time gainful employment because of depression, diabetes, high blood pressure, coronary artery disease, edema in the lower extremities, high cholesterol,  arthritis in the knees and a history of bilateral total knee replacement. Tr. 65-70, 156, 256, 299 and 323.  On September 27, 2012, the administrative law

---

[2]A protective filing occurs when an individual initially contacts the Social Security Administration to file a claim for benefits and requests an expedited filing date. Simply stated, it allows an individual to have an application date based upon the date of his or her first contact with the Administration.

[3]References to "Tr._" are to pages of the administrative record filed by the Defendant as part of the Answer on August 27, 2014.

[4]The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits and supplemental security income benefits on behalf of the Social Security Administration.  Tr. 151 and 157.

judge issued a decision denying Ralph's applications. Tr. 14-24. The administrative

law judge found that Ralph failed to prove that he met the requirements of a listed

impairment or suffered from work-preclusive functional limitations from August 25,

2010, through the date of the decision. Id. As will be explained in more detail *infra*

the administrative law judge found that Ralph was able to perform a limited range

of sedentary work[5] on a full-time basis and identified three positions that Ralph

---

[5]The terms sedentary, light, medium, heavy and very heavy work are defined in the regulations of the Social Security Administration as follows:

(a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

(b) *Light work*.  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as  loss of fine dexterity or inability to sit for long periods of time.

(c) *Medium work*.  Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can do sedentary and light work.

(d) *Heavy work*.  Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

could perform. <u>Id.</u>  On November 21, 2012, Ralph filed a request for review with the Appeals Council. Tr. 8-10.  On May 1, 2014, the Appeals Council concluded that there was no basis upon which to grant Ralph's request for review. Tr. 8-10.  Ralph filed the instant complaint in this court on June 25, 2014.

Ralph makes several arguments, including that the administrative law judge failed to appropriately consider the opinion of a treating physician as well as the opinion of a treating certified registered nurse practitioner.  For the reasons, set forth below the court finds substantial merit in that argument and will remand the case to the Commissioner for further proceedings.

## I.      <u>Standard of Review</u>

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner.  <u>See</u> <u>Poulos v. Commissioner of Social Security</u>, 474 F.3d 88, 91 (3d Cir. 2007); <u>Schaudeck v. Commissioner of Social Sec. Admin.</u>, 181 F.3d 429, 431 (3d Cir. 1999); <u>Krysztoforski v. Chater</u>, 55 F.3d 857, 858 (3d Cir. 1995).  However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence."  <u>Id.</u>; <u>Brown v. Bowen</u>, 845 F.2d 1211, 1213 (3d Cir. 1988); <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993).  Factual findings which are

---

(e) *Very heavy work*.  Very heavy work involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more.  If someone can do very heavy work, we determine that he or she can also do heavy, medium, light and sedentary work.

2 C.F.R. §§ 404.1567 and 416.967.

supported by substantial evidence must be upheld. 42 U.S.C. §405(g); <u>Fargnoli v.</u>
<u>Massanari</u>, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are
supported by substantial evidence, we are bound by those findings, even if we
would have decided the factual inquiry differently."); <u>Cotter v. Harris</u>, 642 F.2d 700,
704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive
by a reviewing court if supported by substantial evidence.").

Substantial evidence "does not mean a large or considerable amount of
evidence, but 'rather such relevant evidence as a reasonable mind might accept as
adequate to support a conclusion.'" <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988)
(quoting <u>Consolidated Edison Co. v. N.L.R.B.</u>, 305 U.S. 197, 229 (1938)); <u>Johnson v.</u>
<u>Commissioner of Social Security</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Hartranft v.</u>
<u>Apfel</u>, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as
more than a mere scintilla of evidence but less than a preponderance. <u>Brown</u>, 845
F.2d at 1213. In an adequately developed factual record substantial evidence may
be "something less than the weight of the evidence, and the possibility of drawing
two inconsistent conclusions from the evidence does not prevent an administrative
agency's finding from being supported by substantial evidence." <u>Consolo v. Federal</u>
<u>Maritime Commission</u>, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in
the record," <u>Cotter</u>, 642 F.2d at 706, and "must take into account whatever in the
record fairly detracts from its weight." <u>Universal Camera Corp. v. N.L.R.B.</u>, 340
U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the
Commissioner ignores countervailing evidence or fails to resolve a conflict created

by the evidence.  <u>Mason</u>, 994 F.2d at 1064.  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642 F.2d at 706-707.  Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

Another critical requirement is that the Commissioner adequately develop the record. <u>Shaw v. Chater</u>, 221 F.3d 126, 131 (2d Cir. 2000)("The ALJ has an obligation to develop the record in light of the non-adversarial nature of benefits proceedings, regardless of whether the claimant is represented by counsel."); <u>Rutherford v. Barnhart</u>, 399 F.3d 546, 557 (3d Cir. 2005); <u>Fraction v. Bowen</u>, 787 F.2d 451, 454 (8th Cir. 1986); <u>Reed v. Massanari</u>, 270 F.3d 838, 841 (9th Cir. 2001); <u>Smith v. Apfel</u>, 231 F.3d 433. 437 (7th Cir. 2000); <u>see</u> <u>also</u> <u>Sims v. Apfel</u>, 530 U.S. 103, 120 S.Ct. 2080, 2085 (2000)("It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits[.]").  If the record is not adequately developed, remand for further proceedings is appropriate.  <u>Id.</u>

**II.    Sequential Evaluation Process**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).

Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims.  See 20 C.F.R. §§ 404.1520 and 416.920; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[6] (2) has an impairment that is severe or a combination of impairments that

---

[6]If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit."  20 C.F.R. §§ 404.1510 and 416.910.

is severe,[7] (3) has an impairment or combination of impairments that meets or

equals the requirements of a listed impairment,[8] (4) has the residual functional

capacity to return to his or her past work and (5) if not, whether he or she can

perform other work in the national economy. Id.  As part of step four the

administrative law judge must determine the claimant's residual functional

capacity. Id.[9]

Residual functional capacity is the individual's maximum remaining ability to

do sustained work activities in an ordinary work setting on a regular and continuing

---

[7]The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. §§ 404.1520(c) and 416.920(c).

An impairment is "severe" if it significantly limits an individuals ability to perform basic work activities.  20 C.F.R. § 404.1521.   Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering. Id.   An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual ability to work.  20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p. If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two.  Id.  If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g).  Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and 416.945(a)(2).

[8]If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step.

[9]If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

basis.  <u>See</u> Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996).  A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule.  The residual functional capacity assessment must include a discussion of the individual's abilities. <u>Id</u>; 20  C.F.R. §§ 404.1545 and 416.945; <u>Hartranft</u>, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

## III.   Developmental, Educational and Work History

Ralph was born in the United States on August 8, 1963, and at all times relevant to this matter was considered a "younger individual"[10] whose age would not significantly impact his ability to adjust to other work. 20 C.F.R. §§ 404.1563(c) and 416.963(c); Tr. 110, 219 and 226.  Ralph graduated from high school in 1980 and can read, write, and converse in English and perform basic mathematical functions. Tr. 257, 298, 300, 344 and 663.  During his elementary and secondary schooling, Ralph attended regular education classes. Tr. 300.  After graduating from high school, Ralph obtained in 1982 an associate degree in culinary arts. Tr. 300, 344 and 655.  Ralph has no history of illicit drug use but has a history of smoking "but quit a long time [ago]" and drinks alcohol occasionally "on a social basis." Tr. 374,  446, 454, 521, 662 and 1156.

---

[10]The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49."  20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). Ralp was 49 years of age at the time of the administrative law judge issued her decision.

Ralph's work history covers 31 years and at least 10 different employers. Tr. 237 and 239-242.  The records of the Social Security Administration reveal that Ralph had earnings in the years 1979 through 2009.  Id.  Ralph's annual earnings range from a low of $1269.62 in 1979 to a high of $39,685.73 in 2005. Id.  After 1995, Ralph's annual earnings never fell below $21,700.71 and averaged  $31,872.88.  Id. The sum of Ralph's earnings during his 31 years of employment  is $686,129.38. Id.

Ralph reported that he worked as a supervisor of a kitchen at a hospital from August, 1995 to August, 2007; as a general manager of a restaurant from July, 2003 to February, 2007; as a cook at a restaurant  from August, 2001 to February, 2002; as a cook for a catering company from February, 2002 to July, 2003; and as a cook for a retirement community from August, 2007 to November, 2009. Tr. 301.  Ralph also stated that he worked at a candy store as a clerk from 1996 to 1997 and as an emergency medical technician for an ambulance service from 1994 to 1997. Tr. 246.

A vocational expert identified Ralph's  past relevant employment[11] as  (1) a cook which the vocational expert described as skilled, medium work, and  (2)  a general manager at a  restaurant also described as skilled, medium work.  Tr. 22 and 93-94.   Ralph has not worked since November 20, 2009. Tr. 300.

---

[11]Past relevant employment in the present case means work performed by Ralph during the 15 years prior to the date his claim for disability was adjudicated by the Commissioner.  20 C.F.R. §§ 404.1560 and 404.1565. To be considered past relevant work, the work must also amount to substantial gainful activity. Pursuant to Federal Regulations a person's earnings have to rise to a certain level to be considered substantial gainful activity.

IV.   __Medical Records__

Before we address the administrative law judge's decision and the arguments of counsel, we will review some of Ralph's  medical records.  The relevant time period in this case for assessing whether substantial evidence supports the administrative law judge's decision denying Ralph disability insurance and supplemental security income benefits is from August 25, 2010, Ralph's amended alleged disability onset date, until September 27, 2012, the date of the administrative law judge's decision.

Based on a request from Paul J. Baughman, D.O., Ralph's primary care physician, Ralph on August 25, 2010, had a consultation regarding bilateral knee pain with Robert R. Kaneda, D.O., at the Orthopedic Institute of Pennsylvania, located in Harrisburg, Pennsylvania. Tr. 571.  A physical examination performed by Dr. Kaneda revealed that Ralph had swelling and crepitus (crackling or popping sounds) in both knees, his active range of motion was slightly reduced and his stance and gait were antalgic. Id.  X-rays revealed evidence of degenerative changes of both knees, right more severe than the left. Id. Dr. Kaneda recommended Synvisc injections[12] of the knees but noted that Ralph would eventually need bilateral total knee replacements. Id.

On September 3, 2010, Ralph was examined on one occasion regarding chest pain and bilateral knee pain by Christine Daecher, D.O., of Adult Medicine &

---

[12]"Synvisc (hyland G-F 20) is similar to the fluid that surrounds the joints of your body. [The] fluid acts as a lubricant and shock absorber for the joints.  Synvisc is used to treat knee pain caused by osteoarthritis." Synvisc, Drugs.com, http://www.drugs.com/synvisc.html (Last accessed May 7, 2015).

Aesthetics, LLC, located in Lemoyne, Pennsylvania. Tr. 572-575.  After performing a physical examination, Dr. Daecher assessment was that Ralph had a history of angina and non-occlusive coronary artery heart disease and she stated that "[if] what he tells me today is in fact true, he has significant angina that may require him to take a long acting Nitro" and "he may still be very limited in [his] ability to do physical activity." Tr. 574-575.  Dr. Daecher further stated that Ralph had active arthritis in both knees and that he eventually might "require bilateral total knee replacements." Tr. 575.  Dr. Daecher also on September 3, 2010, completed a document entitled "Medical Source Statement of Claimant's Ability to Perform Work-Related Physical Activities" in which she opined that Ralph can lift and carry up to 10 pounds occasionally; he can stand and walk 1 to 2 hours cumulative in an 8-hour workday; he can sit 8 hours with alternating sitting and standing at will; he can push and pull up to 10 pounds occasionally; he can occasionally perform postural activities other than kneeling which he only can perform rarely; he has difficulty with reaching with the upper extremities; and he has no environmental limitations. Tr. 576-577.

On September 20, 2010, Ralph had a follow-up appointment with Dr. Kaneda regarding ongoing bilateral knee pain. Tr. 617.  Dr. Kaneda stated that Ralph's insurance did not approve the Synvisc injections.  Id.  Dr. Kaneda further reported that Ralph's condition had deteriorated, particularly the left knee.  Id.  Dr. Kaneda scheduled Ralph for a total joint arthroplasty of the left knee for October 29, 2010, at the Community General Osteopathic Hospital located in Harrisburg. Id.

On September 30, 2010, Ralph had an appointment with Dr. Baughman regarding fluid retention in his lower extremities. Tr. 680.  A physical examination revealed that Ralph's blood pressure was 138/96, he weighed 258 pounds[13] and he had bilateral edema in the lower extremities. Id.  The diagnostic assessment was that Ralph suffered from high blood pressure, edema, fluid retention and diabetes mellitus, type 2. Id.

At follow-up appointment with Dr. Baughman on October 14, 2010, Ralph's blood pressure was 132/100, he weighed 262.6 pounds and he had edema in his hands and feet and joint swelling. Tr. 679.  The diagnostic impression was that Ralph suffered from fluid retention, high blood pressure, high cholesterol and diabetes mellitus, type 2. Id.

Ralph had an appointment with Dr. Baughman on October 22, 2010, regarding a respiratory infection. Tr. 678.  Ralph also complained of anxiety, depression and insomnia. Id. Ralph's blood pressure was 160/96 and he weighed 263 pounds but no edema was noted in his lower extremities or hands. Id.  The diagnostic impression was that Ralph suffered from depression, high blood

---

[13]Some records state that Ralph is 5' 11" tall.  A person of such height and weight has a body mass index of 36 and is considered obese. Center for Disease Control and Prevention. Healthy Weight, Adult BMI Calculator, http://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html (Last accessed May 4, 2015). "Doctors often use a formula based on [the person's] height and weight — called the body mass index (BMI) — to determine if [the person is] obese." Obesity, Definition, Mayo Clinic Staff, MayoClinic.com, http://www. Mayoclinic.com/health/obesity/DS00314 (Last accessed May 4, 2015).  Adults with a BMI of 30 or higher are considered obese. Extreme obesity, also called severe obesity or morbid obesity, occurs when the person has a BMI of 40 or more. With morbid obesity, the person is especially likely to have serious health problems. Id.

pressure (HTN), reactive airway disease (RAD), high cholesterol (HCE) and diabetes mellitus, type 2. Id.  Dr. Baughman prescribed an antibiotic (Z-pak). Id.

On October 29, 2010, Ralph underwent a total left knee replacement and was hospitalized until November 1, 2010. Tr. 715.   Ralph then was admitted for inpatient rehabilitation at Community General Osteopathic Hospital. Tr. 645-647 and 966-967.  He was discharged from that program on November 12, 2010, with instructions to continue with outpatient physical therapy 3 times per week.  Id.   At the time of discharge a physical therapy evaluation was scheduled for him at Pinacle Health Outpatient Rehabilitation. Tr. 645.

On November 16, 2010, Ralph was evaluated by JoAnn Rohrer, a physical therapist at Pinacle Health Outpatient Rehabilitation. Tr. 639-642.  Ralph reported that he had pain negotiating stairs; he had difficulty kneeling and then transitioning to standing; he needed a walker to ambulate; he had pain with bending of his left knee; he had a constant ache in the left knee with occasional sharp pain under the knee cap; and his left knee felt numb with occasional tingling to the foot. Tr. 639. Under objective findings Ms. Rohrer reported Ralph appeared to be in pain;  Ralph was rubbing the left knee and holding his head in hands during the evaluation; his range of motion of the knee was limited; she was unable to assess strength because of the limited range of motion; Ralph needed a walker to ambulate; the girth of his left knee was greater than the right because of the presence of edema; and his left knee was tender to palpation. Tr. 640-641.  In setting the goals of the physical therapy program Ms. Rohrer noted the need to reduce the presence of the edema. Tr. 641.  She also set as a goal for Ralph the ability to ambulate without an assistive

device, to walk four blocks without an assistive device, and to ascend and descend stairs reciprocally. Id.

On November 26, 2010, Ralph had a follow-up appointment with Dr. Kaneda regarding his left total knee replacement. Tr. 619-621.  A physical examination revealed that Ralph had some moderate swelling of the left knee and limited range of motion. Tr. 619.  Dr. Kaneda stated that if physical therapy did not increase the range of motion of Ralph's left knee that consideration would be given to a manipulation of the knee under general anesthesia. Tr. 619-620 and 622.

From November 16 through December 17, 2010, Ralph had 15 physical therapy appointments at Pinacle Health with Ms. Rohrer.  Tr. 637 and 643. After an appointment on December 3, 2010, Ms. Rohrer reported that Ralph's left knee range of motion had improved but progress was slow and his gait was still abnormal. Tr. 644.  She further reported that edema was still present in left knee. Id.  On December 17, 2010, Ms. Rohrer reported that the edema in Ralph's left knee had "mildly decreased" and his range of motion had improved but "plateaued over the past 2 weeks." Tr. 638.  Ms. Rohrer further stated that Ralph's gait remained abnormal because of decreased range of motion of the left knee. Id.  She recommended that Ralph continue with physical therapy 3 times per week for 4 weeks and noted that therapy would be scheduled after Ralph had an appointment with Dr. Kaneda on December 20, 2010, if Dr. Kaneda so recommended. Id.

On December 20, 2010, Dr. Kaneda's physical examination of Ralph revealed that Ralph had limited range of motion and moderate swelling of the left knee. Tr. 622.  Dr. Kaneda diagnosed Ralph as suffering from post operative arthrofibrosis of

the left knee[14] and scheduled a manipulation of Ralph's left knee under general anesthesia.  Tr. 622.  The manipulation was performed on December 28, 2010. Tr. 623.   Also, on that date Ralph's knee was injected with  corticosteroid pain medication. Tr. 707-708.

On December 29, 2010, Ralph underwent a physical therapy outpatient re-evaluation by Michelle Linker, a physical therapist, at Pinacle Health.  Tr. 633-635. During this evaluation Ralph reported increased knee pain following the manipulation of the knee under general anesthesia and that he was told by the physician that "there was a significant amount of crepitus with the manipulation."[15] Tr. 633.  Under objective findings, Ms. Linker reported that Ralph had limited range of motion of the left knee and there was edema present; Ralph ambulated with an antalgic gait; and he rubbed his left knee. Tr. 634.  Ms. Linker recommended that Ralph continue with physical therapy. Tr. 635.

On January 4, 2011, Ralph underwent cardiac testing at the Holy Spirit Hospital located in Camp Hill, Pennsylvania. Tr. 61-613.  The testing revealed (1) a

---

[14]Arthrofibrosis is an inflammatory condition which leads to excessive scar tissue formation and results in tissue adhesion and restriction of the motion of a joint. See Arthrofibrosis After Knee Replacement, Healthline, http://www.healthline.com/health/total-knee-replacement-surgery/arthrofibrosis (Last accessed May 7, 2015).

[15]The operative report states that "the left lower extremity was moved gently through a range of motion with snapping and popping occurring with lysis of the adhesions." Tr. 707.  Lysis is defined as "mobilization of an organ by division of restraining adhesions." Dorland's Illustrated Medical Dictionary, 1089 (32nd Ed. 2012).

right bundle branch block;[16]  (2) no evidence of myocardial ischemia;[17] (3) mild

concentric left ventricular hypertrophy;[18] and (4) normal left ventricular systolic

function with a calculated ejection fraction of 61%.[19] Id.

_____

[16]"Bundle branch block is a condition in which there's a delay or obstruction
along the pathway that electrical impulses travel to make your heart beat.  The
delay or blockage may occur on the pathway that sends electrical impulses to the
left or the right side of the bottom chambers (ventricles) of your heart.  Bundle
branch block sometimes makes it harder for your heart to pump blood efficiently
through your circulatory system." Bundle branch block, Mayo Clinic Staff, Mayo
Clinic, Definition, http://www.mayoclinic.org/diseases-conditions/bundle-branch-
block/basics/definition/con-20027273 (Last accessed May 7, 2015). Symptoms of this
condition include fainting (syncope) and feeling as if you're going to faint
(presyncope). Id., Symptoms, http://www.mayoclinic.org/diseases-conditions/
bundle-branch-block/basics/symptoms/con-20027273 (Last accessed May 7, 2015).  A
right bundle branch block may be caused by a congenital defect, a heart attack,
viral or bacterial infection of the heart muscle, high blood pressure, and a blood clot
in the lungs (pulmonary ebolism). Id., Causes, http://www.mayoclinic.org/diseases-
conditions/bundle-branch-block/basics/causes/con-20027273(Last accessed May 7,
2015).

[17]"Myocardial ischemia occurs when blood flow to your heart muscle is
decreased by a partial or complete blockage of your heart's arteries (coronary
arteries). The decrease in blood flow reduces your heart's oxygen supply."
Myocardial ischemia,, Mayo Clinic Staff, Mayo Clinic, Definition,
http://www.mayoclinic.org/diseases-conditions/myocardial-ischemia/basics/
definition/CON-20035096 (Last accessed May 7, 2015).

[18]"Left ventricular hypertrophy is enlargement (hypertrophy) of the muscle
tissue that makes up the wall of your heart's main pumping chamber (left ventricle).
Left ventricular hypertrophy develops in response to some factor, such as high
blood pressure, that requires the left ventricle to work harder.  . . .  Left ventricular
hypertrophy is more common in people who have uncontrolled high blood pressure
or other heart problems."  Left ventricular hypertrophy,  Mayo Clinic Staff, Mayo
Clinic, Definition, http://www.mayoclinic.org/diseases-conditions/left-ventricular-
hypertrophy/basics/definition/CON-20026690 (Last accessed May 7, 2015).

[19]The ejection fraction is the percentage of blood pumped out of the left
ventricle of the heart in a single beat. A normal left ventricle ejection fraction is 55
percent or higher. Martha Grogan, M.D., Ejection fraction: What does it measure?,
Mayo Clinic, http://www.mayoclinic.org/ejection-fraction/expert-answers/FAQ-
20058286 (Last accessed May 7, 2015).  Experts disagree about the significance of an

On January 7, 2011, Ralph had a physical therapy appointment with Ms. Linker at which Ralph reported that he could walk unlimited distances with a single point cane.  Tr. 629-631.  Ms. Linker noted that Ralph's gait was abnormal because he had decreased heel strike and decreased stance time on the left but that his gait improved with verbal cues; he was able to ascend stairs with a reciprocal gait; he was able to descend stairs with a reciprocal gait but he had to compensate by externally rotating and abducting the left lower extremity while leaning on the right railing; he had edema present at the left knee; he had decreased range of motion of the left knee; and he had normal muscle strength in the left lower extremity except with respect to hip flexion. Tr. 629.  Ms. Linker noted that Ralph had demonstrated good progress with range of motion, strength and pain levels but that he needed to focus on improving range of motion and gait pattern. Id.  Ms. Linker recommended that Ralph continue with physical therapy. Id.

On January 10, 2011, Ralph had an appointment with Dr. Kaneda regarding his ongoing problems with his knees. Tr. 624.  Dr. Kaneda noted that Ralph had degenerative joint disease of both knees as well as postoperative arthrofibrosis of the left knee but that with respect to the left knee he was "doing better since his manipulation." Id.  Dr. Kaneda stated that Ralph continued to have "persistent symptoms in his right knee, for which he is scheduled in the near future for a total

---

ejection fraction between 50 and 55% .  Id.   Some consider it a "borderline" range. Id.   Causes of a decreased ejection fraction are heart muscle weakness, a heart attack which has damaged the muscle, problems with heart valves and uncontrolled high blood pressure. Id.

[knee replacement]." Id.  Dr. Kaneda stated that Ralph had minimal to moderate swelling in the left knee. Id.

On January 26, 2011, Ralph was discharged from physical therapy because of non-compliance with appointments. Tr. 628.  It was reported that Ralph had attended a total of 23 therapy sessions but had not attended a therapy appointment since January 14, 2011. Id.

On January 9, 2011, Ralph had an appointment with Dr. Baughman, his primary care  physician, regarding lightheadedness and pain in the outer right part of his right foot. Tr. 674.  Ralph further stated that he was retaining a lot of fluid, his legs had been swelling resulting in pain, his legs get stiff after sitting or standing for awhile and he was having difficulty walking. Id.  Under objective findings, Dr. Baughman reported that Ralph's blood pressure was elevated at 140/96 and he weighed 259 pounds with a BMI of 36.1. Id.  The remaining physical examination findings reported were essentially normal, including it was stated that Ralph walked with a normal gait. Id.  Dr. Baughman's diagnostic assessment was that Ralph suffered from cardiac dysrhythmia, osteoarthrosis localized primarily in the lower leg, high cholesterol and diabetes mellitus, type 2, controlled. Tr. 675.

On February 26, 2011,  Ralph visited the emergency department of the Harrisburg Hospital after experiencing a syncopal episode (fainting) at home. Tr. 782.  Ralph reported that "he was sitting having coffee and he woke up slumped over on the table." Id.  He notified Dr. Baughman who recommended that he visit the emergency department for evaluation. Tr. 783.  A physical examination performed by the emergency department physician was essentially normal other

than his pulse rate was 94.  Tr. 699-700. An EKG revealed a bifascicular block[20] with

a right bundle branch block and a left anterior fascicular block and he had an

abnormal QRS of .162 seconds (normal .06 to .10 seconds).[21] Tr. 700.   Also, a chest

x-ray revealed that Ralph had inadequate inspiration with questionable borderline

cardiomegaly (enlargement of the heart). Id.   Ralph was admitted to the hospital for

observation and further evaluation. Id.  The emergency room physician's diagnostic

assessment was syncope and recurrent syncope of unclear etiology. Id.  Subsequent

to his admission he was again examined by a physician who reported that Ralph

had decreased breath sounds bilaterally and when Ralph took deep breaths he

became symptomatic, i.e., he suffered a dizzy spell. Tr. 786.  The physician also

observed that Ralph had trace edema in the bilateral lower extremities. Id.

Otherwise, the results of a physical examination were normal. Id.  The physician

noted that Ralph appeared stable but ordered further monitoring and testing. Tr.

787.

     After further testing and observation, Ralph was deemed stable and

asymptomatic. Tr. 782-783.  A chest x-ray showed no acute pathology; a CT of the

chest revealed no evidence of a pulmonary embolism and no acute

cardiopulmonary abnormality; a CT of the brain revealed no acute intracranial

abnormality; and all other diagnostic tests were essentially normal except an EKG

---

[20]A fascicular block is similar to a a bundle branch block.  It is an electrical
conduction abnormality in the heart muscle.

[21]The QRS complex is the typical and most prominent upward and downward
spike that is observed on the ECG or EKG printout.  Wide QRS complexes, those
lasting longer than normal are indicative, inter alia, of bundle branch blocks.

revealed a right bundle branch block. Id.  Ralph was discharged from the hospital

on February 27, 2011, with instructions to follow-up with his cardiologist. Id.   His

discharge medications were the antidepressant Cymbalta, the high blood pressure

medication lisinopril, the diuretic Lasix, aspirin, the potassium supplement Klor-

Con,[22] the cholesterol reducing medication TriCor, the antipsychotic medication

Seroquel which is also used to treat manic depression, the vitamin niacin, the

cholesterol reducing medication simvastatin, the antidepressant trazodone and the

stomach acid reducer Protonix. Id.

On March 8, 2011, at the request Dr. Baughman, Ralph was evaluated

regarding his complaints of syncope and dizziness by David Scher, M.D., a

cardiologist with Associated Cardiologists located in Harrisburg. Tr. 818-821.  Ralph

reported multiple syncopal episodes as well as lightheadedness.  Tr. 818.  Dr. Scher

noted that Ralph underwent a cardiac catherization in 2007 which revealed a 50%

lesion of a distal right coronary artery but that he had a normal ejection fraction

over the years and a recent echocardiogram and nuclear stress test both were

unremarkable. Id.  Dr. Scher stated that Ralph was on multiple diuretics for feet

swelling and that he did not have any signs or symptoms of congestive heart failure

but that he had mild left ventricular hypertrophy and a right bundle branch block

---

[22]Certain medicines can lower the normal blood level of potassium.
Abnormally low levels of blood potassium is known as hypokalemia. Potassium is
"critical for the proper functioning of nerve and muscle cells, particularly heart
muscle cells."  Low potassium (hypokalemia), Mayo Clinic Staff, Definition,
http://www.mayoclinic.org/symptoms/low-potassium/basics/definition/SYM-
20050632 (Last accessed May 7, 2015).

and first-degree AV block.[23] Id. The results of a physical examination were essentially normal other than Ralph was obese. Tr. 820. Dr. Scher's impression was that Ralph's symptoms of syncope and dizziness were medication related and "orthostatic in nature." [24] Tr. 820-821.  Dr. Scher decreased the dosage of one diuretic, Lasix from 40 mg to 20 mg, and eliminated a second diuretic, hydrochlorothiazide which was being used in conjunction with the blood pressure medication lisinopril, and recommended that Ralph consult with his psychiatrist regarding whether he should discontinue the drug Seroquel which could be contributing to his symptoms. Id.

On March 18, 2011, Ralph had an appointment with Maryium Khan, a physician assistant working with Dr. Baughman, to obtain medical clearance for an upcoming right total knee replacement. Tr. 891-893.  At that appointment Ralph reported that he was still experiencing dizzy spells.  The objective physical examination findings reported by Ms. Khan were normal other than Ralph remained obese with a BMI of 37.9. Tr. 892.

On March 24, 2001, Ralph had an appointment with Trevor Broadbent, a physician assistant working with Dr. Scher, to obtain clearance for the knee

---

[23]A first-degree AV(atrioventricular)  block is another type of electrical conduction abnormality which shows up on an EKG.  The electrical conduction traveling from the atria, the upper chambers to the ventricles, lower chambers, as it passes through what is know as the AV node is slowed or delayed. See Heart Block, Topic Overview, WebMD, http://www.webmd.com/a-to-z-guides/heart-block-topic-overview (Last accessed May 7, 2015).

[24]Orthostatic refers to moving from a sitting to standing position or symptoms brought on by standing.

surgery. Tr. 881-885.  In the report of this appointment Mr. Broadbent noted that Ralph was previously seen by Dr. Scher for complaints of syncope and dizziness and that he was asked to cut back on his diuretics to see if this made any improvement. That has been about two weeks now. Mr. Ralph has seen no improvement in his symptoms.  He will often at times get dizzy for no reason while just sitting. He does not notice that there is any worsening of his condition with change of position. The Seroquel was not changed because his psychiatrist felt that he needed to continue that.  He did not feel that it was contributing to his symptoms.  Mr. Ralph stated that almost every other day or daily he will have episodes of severe lightheadedness.  They come on and last several minutes and then go away on their own.  . . .  Dr. Scher had recommended that if these measures of cutting back on his diuretics did not seem to improve, that we [would ] go forward with an electrophysiology study to evaluate his symptoms.[25]

Tr. 881.  The objective physical examination findings reported by Mr. Broadbent were normal other than Ralph remained obese. Tr. 884-885.   Mr. Broadbent's impression, inter alia, was that Ralph suffered from recurrent episodes of near syncope.  Tr. 885.  Mr. Broadbent explained the risks, benefits and alternatives to an electrophysiology study and Ralph stated that he wanted to proceed with the

---

[25]An electrophysiology study "is a special catheterization test, in which electrode catheters (flexible, insulated wires with metal electrode tips) are inserted in to the heart in order to study the cardiac electrical system." Richard N. Fogoros, M.D., The Electrophysiology Study, about health, http://heartdisease.about.com/od/palpitationsarrhythmias/a/EPStudy.htm (Last accessed May 7, 2015).

study. Id.  Because Ralph "complained of worsening of his swelling and some

[shortness of breath] on exertion as well that has been worse since decreasing his

Lasix dose" Mr. Broadbent increased Ralph's dosage of Lasix. Id.

On April 19, 2014, Ralph had an appointment with Dr. Baughman regarding

swelling and pain in his lower extremities. Tr. 889. Dr. Baughman noted that Ralph

was taking Lasix 40 mg and also was wearing compression stockings daily, but

neither seemed to be helping. Id.  Dr. Baughman further reported as follows:

> His cardiologist, Dr. S[c]her, discontinued [hydrochlorothiazide] and
> decreased [his] lisinopril dose. [Ralph] also had to stop Lasix temporarily
> because of hypotension and a syncopal episode.  Lasix was later restarted by
> his cardiologist's physician assistant because [Ralph's] swelling was
> becoming severe.  His cardiologist also suggested discontinuing Seroquel, but
> his psychiatrist, Dr. Aggarwal, wanted him to continue the medication.
> [Ralph] had an appointment with his psychiatrist last Tuesday, and [Ralph]
> may be starting Abilify[26] in the future. [Ralph] reports he underwent an
> electrophysiologic  study on 4/14/11.[27]

Id.  Dr. Baughman reported that Ralph's blood pressure was elevated at142/96 and

he weighed 286 pounds with a BMI of 39.9 just below the borderline of being

considered morbidly obese. Id.  Ralph also had pitting edema in the bilateral lower

extremities. Tr. 890.

Also, on April 19, 2011, Dr. Baughman's physician assistant, Julie Saricks,

completed a disability form in which she stated that Ralph was temporarily disabled

from April 19 to July 31, 2011, because he had "severe venous insufficiency and

---

[26]Abilify is an antipsychotic medication used to treat schizophrenia but is also
used with other medication to treat major depressive disorder in adults. Abilify,
Drugs.com, http://www.drugs.com/abilify.html (Last accessed May 7. 2015).

[27]The court's review of the administrative record did not reveal a report of the
electrophysiology study or the psychiatric notes of Dr. Aggarwal.

edema, which causes severe pain and difficulty standing [and] ambulating." Tr. 888.
At an appointment with Dr. Baughman on May 10, 2011, Ralph remained obese, his
blood pressure was elevated at 132/92 and he continued to have pitting edema of the
bilateral lower extremities. Tr. 976-977.

On May 23, 2011, Ralph had an appointment with Dr. Kaneda regarding
ongoing pain in his left knee. Tr. 919.  Dr. Kaneda reported that Ralph had
decreased range of motion and fluid build-up (effusion) in the left knee. Id.   On
May  27, 2011, Dr. Kaneda performed an ultrasound-guided left knee aspiration. Tr.
1049.  Dr. Kaneda obtained 25 cc of amber-colored fluid from the joint of the left
knee. Id.   At an appointment with Dr. Baughman on June 1, 2011, Ralph
complained of swollen and painful legs.  Tr. 974-975.  A physical examination
revealed that Ralph remained obese with a BMI of 37.9 and continued to have
edema in the bilateral lower extremities. Id.

On June 13, 2011, Ralph had an appointment with Dr. Kaneda at which he
again complained of a painful left knee. Tr. 918.  A physical examination revealed
that Ralph had restricted range of motion of the left knee. Id.  Dr. Kaneda's
assessment was that Ralph suffered from persistent arthrofibrosis of the left knee.
Id.  Dr. Kaneda scheduled a second manipulation of the left knee under general
anesthesia. Tr. 918 and 1041.

At the beginning of July, 2011, Ralph was hospitalized at the Pennsylvania
Psychiatric Institute in Harrisburg for depression and suicidal thoughts. Tr. 910-
913.  At the time of his admission he was diagnosed with depressive disorder, not
otherwise specified, and he was given a Global Assessment of Functioning (GAF)

score of 37.[28] Tr. 912.  Ralph had attempted to overdose on his prescription

medications. Tr. 904.  After being admitted to the Psychiatric Institute he was

started on antidepressant medications and was involved in group and individual

psychiatric therapy. Tr. 904-905.  Ralph was discharged from the Psychiatric

Institute on July 19, 2011, in a stable condition.  Id.  At the time of discharge Ralph

was given a GAF score of 60. Tr. 904.

On August 16, 2011, Dr. Kaneda manipulated Ralph's left knee under general

anesthesia and then injected the knee with a corticosteroid pain medication. Tr.

1041.  On August 17, 2011, Ralph commenced physical therapy at the Carlisle

---

[28] The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness.  *Diagnostic and Statistical Manual of Mental Disorders* 3–32 (4th ed. 1994). A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range.  Id. The score is useful in planning treatment and predicting outcomes.  Id.  The GAF rating is the single value that best reflects the individual's overall functioning at the time of examination.  The rating, however, has two components: (1) symptom severity and (2) social and occupational functioning.  The GAF is within a particular range if either the symptom severity or the social and occupational level of functioning falls within that range.  When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the worse of the two.  Thus, a suicidal patient who is gainfully employed would have a GAF rating below 20.  A GAF score of 21-30 represents behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas.  A GAF score of 31-40 represents some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood.  Id.  A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning.  Id.  A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning.  Id. A GAF score of 61 to 70 represents some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well with some meaningful interpersonal relationships.  Id.

Regional Medical Center. Tr. 939-941.  From August 17, through October 14, 2011,

Ralph had 16 physical therapy sessions. Tr. 924-935.

On September 12, 2011, Dr. Kaneda reported that Ralph's range of motion of

the left knee had returned to essentially normal but that he had persistent pain in

the right knee and the pain had increased in severity and intensity "as time goes

on." Tr. 916. Dr. Kaneda noted that Ralph walked with an antalgic gait and that

diagnostic testing revealed evidence of significant joint space narrowing in the right

knee. Id.  Dr. Kaneda scheduled right knee replacement surgery. Id.

On September 27, 2011, Ralph had an appointment with Lisa Malys, D.O., at

Saddler Health Center located in Carlisle, Pennsylvania,  regarding a sinus

infection.[29]  Tr. 988 and  1095. During this appointment, Dr. Malys noted that Ralph

had edema below the knees and that he was scheduled for a total right knee

replacement on October 25, 2011. Tr. 1095.  On October 21, 2011, Dr. Malys noted

that Ralph had trace edema in the extremities and cleared Ralph for knee surgery

unless the results of blood work which was ordered were abnormal. Tr. 1093-1094.

On October 25, 2011, Ralph underwent a right total knee replacement which

was performed by Dr. Kaneda at Community General Osteopathic Hospital. Tr. 915

and 1017-1018 . Ralph was discharged from the hospital on October 28, 2011, in a

stable condition with instructions to change the surgical dressing daily and keep it

clean and dry and to follow-up with Dr. Kaneda in 10 to 14 days. Tr. 993. Ralph was

given a prescription for the pain medication Percocet and the medication

---

[29]Dr. Malys commenced acting as Ralph's primary care physician on or about
August 3, 2011. Tr. 1328 and 1332.

Coumadin to take as needed for deep venous thrombosis prophylaxis. Tr. 993-994. On November 1, 2011, Ralph underwent a physical therapy evaluation and it was recommended that Ralph be seen 3 times per week for an unspecified duration. Tr. 943. It was noted that Ralph was scheduled to see Dr. Kaneda on November 9, 2011, to have the surgical staples removed and x-rays. Tr. 942. On November 9, 2011, Dr. Kaneda reported that Ralph's "previous complaints of pain [were] gone" and that the x-rays of the right knee show[ed] evidence of a well-aligned total joint with evidence of minimal change." Tr. 914.

From November 2, 2011, through November 23, 2011, Ralph had 8 physical therapy sessions. Tr. 945-951. On November 8, 2011, it was noted by the physical therapist that the edema in the lower extremities remained but that his range of motion was improving. Tr. 946. On November 23, 2011, the physical therapist reported that Ralph had "significant improvement in the fluidity of gait mechanics." Tr. 948.

Other than the physical therapy records and Dr. Kaneda's notes of the appointment on November 9th, the court's review of the administrative record did not reveal any other medical treatment notes during November. The next appointment record that we encounter is from December 20, 2011. Tr. 1091. On that date Ralph had an appointment with Dr. Malys regarding his diabetes. Tr. 1091. The notes of this appointment indicate that Ralph had knee surgery and was recovering slowly. Id. The objective physical examination findings reported by Dr. Malys were all essentially normal other than he remained obese. Id.

28

On January 18, 2012, in the evening,  Ralph visited the emergency department of the Holy Spirit Hospital located in Camp Hill complaining of chest pain which radiated to the back, dizziness, headache, palpations and shortness of breath.[30] Tr. 1272 and 1277-1278.   Ralph was admitted to the hospital for observation and further evaluation and diagnostic testing  but then  discharged in a stable condition the next day with instructions to undergo a stress test on an outpatient basis. Tr. 1275.  A physical examination performed on January 19, 2012, revealed that Ralph's extremities were free of edema. Tr. 1278.

On February 22, 2012, Ralph had an appointment with Dr. Malys to follow-up on his diabetes, high blood pressure, benign prostatic hyperplasia (BPH)[31] and laboratory blood work. Tr. 1088.   Ralph also reported painful and swollen toes, periodic chest pain and edema in the bilateral lower extremities. Id.  Dr. Malys noted under objective physical examination findings that Ralph had positive edema in the bilateral lower extremities and decreased sensation in toes and feet.  Id. Ralph's blood pressure was elevated at 142/82 and he weighed 277 pounds with a BMI of 40.4 placing him in the morbidly obese category.[32] Id.  Dr. Malys's assessment was that Ralph suffered from benign prostatic hyperplasia, high blood

---

[30]The medical records are inconsistent as to whether Ralph initially reported shortness of breath. However, at the time of discharge he denied chest pain, shortness of breath, palpitations, nausea, vomiting or dizziness. Tr. 1277.

[31] BPH is a benign enlargement of the prostate.  At a prior appointment Ralph reported difficulty urinating and it was partly attributed to an enlarged prostate and he was prescribed Avodart which is used to treat that condition.

[32]At this appointment Ralph's height was recorded as 5' 9 ½" instead of 5' 11."

pressure, high cholesterol and neuropathy as evidenced by the decreased sensation in his feet and toes. Tr. 1089.  Dr. Malys added the drug Flomax to treat his BPH; she continued his prescription for lisinopril to treat his high blood pressure; she increased his dosage of Crestor to treat his high cholesterol and noted that Ralph was "not at goal" with respect to the impact of high cholesterol on his diabetes and coronary artery disease; and she started Ralph on the drug Neurontin to treat his neuropathy.[33] Id.

Also, on February 22, 2012, Dr. Malys completed a disability form in which she stated that Ralph was temporarily disabled from February 22, 2012 to January 31, 2013 because of knee pain and lower extremity edema. Tr. 1079.  Dr. Malys further reported that Ralph's primary diagnosis was major depressive disorder with secondary diagnoses of osteoarthritis, peripheral vascular disease with lower extremity edema, coronary artery disease and diabetes mellitus, type 2. Id.

On March 27, 2012, Dr. Malys completed a Cumberland County Housing and Redevelopment Authority form on behalf of Ralph in which she certified that Ralph was disabled to such an extent that he was unable to engage in any substantial gainful activity because of a physical and mental impairments. Tr. 1099.

On April 2, 2012, Ralph had an appointment with Dr. Kaneda at which Ralph reported ongoing problems with his knees. Tr. 1100.  Dr. Kaneda observed that

---

[33]Although a non-approved use by the FDA, Neurontin (generic gabapentin) is used to treat diabetic neuropathy.  Gabapentin, Neurontin, Gralise, MedicineNet.com, http://www.medicinenet.com/gabapentin/article.htm (Last accessed May 7, 2015).

Ralph had limited range of motion of the knees and told Ralph that "it just simply takes a long time to get better." Id.

On July 30, 2012, Christina Basonic, a certified registered nurse practitioner, completed a document entitled "Physical Residual Functional Capacity Questionnaire" on behalf of Ralph. Tr. 1323-1327.  Ms. Basonic is a nurse associated with one of Ralph's treating cardiologists, Venkatesh Nadar, M.D., who at the time was a cardiologist with Lewin & Nadar Cardiology Associates, at 425 North 21st Street, Camp Hill, and affiliated with the Holy Spirit Hospital located in Camp Hill. Tr.1327 and  1373.  Ms. Basonic stated that she examined Ralph every six months since 2007 and that his diagnoses was coronary artery disease, high blood pressure and high cholesterol. Tr. 1323.  Ms. Basonic listed Ralph's symptoms as chest pain, palpitations, fatigue and shortness of breath (dyspnea). Id.  Ms. Basonic stated that Ralph had pressure across the chest which radiated to the arms, occurs every few weeks rated as an 8 on pain scale of 1 to 10 and also occurs even when resting. Id. Ms. Basonic opined that Ralph in an 8-hour workday could stand less than 2 hours and sit at least 6 hours with a sit and stand option at will.  Tr. 1325.  Ms. Basonic stated that with prolonged sitting Ralph would need to elevate his legs two pillows high for up to 50% of the time;  he needed a cane to ambulate; he could frequently lift less than 10 pounds but only occasionally lift 10 pounds; he could never lift 20 pounds or more; his impairments would produce "good days" and "bad days;" and on average he would be absent from work as a result of his impairments or treatment more than four days per month. Tr. 1324-1326.  Ms. Basonic opined that Ralph's impairments were expected to last at least 12 months. Tr. 1323.  Ms.

Basonic noted that her assessment of Ralph's functional ability was sent to Dr. Venkatesh. Id.

On August 3, 2012, Dr. Malys completed the same physical functional capacity questionnaire on behalf of Ralph. Tr. 1328-1332.   Dr. Malys  stated that she examined Ralph every 3 to 4 months for 1 year and that his diagnoses was coronary artery disease, diabetes, high blood pressure, high cholesterol, osteoarthritis, degenerative joint disease, urinary retention, benign prostatic hyperplasia, and bipolar depression. Tr. 1328.  Dr. Malys listed Ralph's symptoms as knee pain, fatigue and chest pain. Id.  Dr. Malys stated that Ralph had daily chest pain and knee pain with the severity varying. Id.  Dr. Malys opined that Ralph could sit less than 2 hours, stand less than 2 hours and walk less than 2 hours during an 8-hour workday; Ralph would need a job which permitted shifting positions at will from sitting, standing or walking; Ralph would need to take unscheduled breaks for 5 to 10 minutes on an hourly basis during an 8-hour workday;  with a sedentary position Ralph would need to elevate his legs a height of 12 inches for at least 6 hours; he could frequently lift less than 10 pounds but only occasionally lift 10 pounds; he could rarely lift 20 pounds and never lift 50 pounds; his impairments would produce "good days" and "bad days;" and on average he would be absent from work as a result of his impairments or treatment about three days per month.  Tr. 1330-1331.

On August 7, 2012, Ralph underwent a left heart catherization, coronary angiography and left ventriculography performed at the Holy Spirit Hospital by Dr. Nadar who was assisted by Ms. Basonic.Tr. 1333 and 1373.  These procedures revealed that Ralph had a 30 to 40% diffuse stenosis of the left main coronary

artery, an 80% ostial and proximal stenosis of the left anterior descending artery (LAD),[34] an 80% stenosis of the obtuse marginal II branch, a 30% stenosis of the right coronary artery, and a 50% stenosis involving the ostium of the posterior descending coronary artery (PDA). Id.  Ralph's left ventricular ejection fraction was 50%.  Id.  The recommendation was that Ralph undergo coronary bypass surgery (robotic LIMA (left internal mammary artery)  to LAD). Id.

Subsequently,  Ralph was referred by Dr. Malys to Christine M. McCarty, M.D., a thoracic surgeon, with CardioVascular Surgical Institute located in Camp Hill for a second examination and opinion.  On August 16, 2012, after examining Ralph and reviewing the reports of the recent procedures performed by Dr. Nadar, Dr. McCarty agreed with Dr. Nadar's recommendation for bypass surgery. Tr. 1333-1334. Dr. McCarty stated that Ralph's "ejection fraction was in the low point of normal at 50%." Tr. 1333.  Dr. McCarty noted that Ralph had "significant bivessel coronary disease" and risk factors for coronary disease including high blood pressure, high cholesterol and diabetes. Tr. 133-1334.  Dr. McCarty also stated that Ralph's diabetes was poorly controlled and that the only real issue she had with proceeding with bypass surgery was his poorly controlled diabetes. Tr. 1334.  She recommended taking steps to expedite bringing his blood sugars to an acceptable level, including the possibility of using insulin. Id.  Dr. McCarty further stated that Ralph "still is having chest discomfort which bothers me especially in view of the fact that he has a very tight ostial stenosis in the left anterior descending [artery]"

---

[34]Cardiologists refer to the obstruction of the LAD as the "widow maker" because a massive heart attack is caused if the LAD is completely occluded.

and that she would like to "follow through on a very rapid basis to get him toward the operating room." <u>Id.</u>

## V.    <u>Discussion</u>

The administrative law judge at step one of the sequential evaluation process found that Ralph did not engage in substantial gainful work activity since August  25, 2010,  the amended alleged onset date. Tr. 16

At step two of the sequential evaluation process, the administrative law judge found that Ralph had the following severe impairments: "Degenerative Joint Disease of the Knees, Obesity and Major Depressive Disorder." <u>Id.</u>   The administrative law judge found that Ralph's diabetes, lower extremity edema, high cholesterol, high blood pressure and coronary artery disease although medically determinable impairments were not severe. Tr. 17.

At step three of the sequential evaluation process the administrative law judge found that Ralph did not have an impairment or combination of impairments that met or equaled the requirements of a listed impairment. Tr. 17-18.

At step four of the sequential evaluation process, the administrative law judge limited Ralph to sedentary work as defined in the regulations except Ralph would need to alternate between sitting and standing at will; he could not reach overhead with either upper extremity; he was limited to occasional postural activities, including squatting, kneeling, stooping, climbing ramps and stairs, and balancing; he was prohibited from climbing ladders, ropes and scaffolds; he could not engage in crawling; he was limited to understanding, remembering and carrying out simple instructions; he was limited to performing jobs which involved

routine repetitive tasks with only occasional decision making and exercise of judgment; he could not engage in production rate piece work; he had to be limited to occupations involving only occasional changes in the work setting; and he had to be limited to occupations involving only occasional interaction with supervisors, coworkers and the public. Tr. 19.

Based on the above residual functional capacity and the testimony of a vocational expert the administrative law judge found at step five of the sequential evaluation process that Ralph could perform unskilled, sedentary work as a dowel inspector, security system monitor and table worker quality control,  and that there were a significant number of such jobs in the local and national economies. Tr. 23.

The administrative record in this case is 1378 pages in length consisting, inter alia, of vocational and medical records. We have thoroughly reviewed that record. Ralph argues, inter alia, that the administrative law judge erred by failing to appropriately consider all of Ralph's severe impairments and erred by rejecting the opinions of Dr. Malys and Ms. Basonic regarding his physical functional capacity. With respect to the first argument, Ralph claims that the administrative law judge did not consider his diabetes, edema, high blood pressure and coronary artery disease as severe impairments.

The Social Security regulations contemplate the administrative law judge considering whether there are any medically determinable impairments and then when setting a claimant's residual functional capacity considering the symptoms of both medically determinable severe and non-severe impairments. 20 C.F.R. § 404.1529.  The determination of whether a claimant has any severe impairments, at

step two of the sequential evaluation process, is a threshold test. 20 C.F.R. §

404.1520(c). If a claimant has no impairment or combination of impairments which

significantly limit the claimant's physical or mental abilities to perform basic work

activities, the claimant is "not disabled" and the evaluation process ends at step

two. Id.   If a claimant has any severe impairments, the evaluation process

continues.  20 C.F.R. § 404.1520(d)-(g).  A failure to find a medical condition severe

at step two will not render a decision defective if some other medical condition was

found severe at step two. Snedeker v. Commissioner of Social Security, 244

Fed.Appx. 470, 474   (3rd Cir. 2007); Desando v. Astrue, 2009 WL 890940, *5 (M.D.Pa.

2009)(Vanaskie, J.).  However, all of the medically determinable impairments both

severe and non-severe must be considered at step two and then at step four when

setting the residual functional capacity.  The social security regulations mandate

such consideration and this court has repeatedly so indicated. See, e.g., Christenson

v. Astrue, Civil No. 10-1192, slip op. at 12 (M.D. Pa. May 18, 2011)(Muir, J.); Little v.

Astrue, Civil No. 10-1626, slip op. at 19-21 (M.D.Pa. September 14, 2011)(Kosik, J.);

Crayton v. Astrue, Civil No. 10-1265, slip op. at 32-35 (M.D.Pa. September 27,

2011)(Caputo, J.); 20 C.F.R. §§ 404.1523 and 404.1545(a)(2).

Although the administrative law judge did not consider Ralph's diabetes,

edema, high blood pressure and coronary artery disease as severe impairments, she

did find that they were medically determinable, non-severe impairments,  and

stated that she took them into consideration when setting Ralph's residual

functional capacity.  Tr. 17.  Consequently, we cannot conclude that the

administrative law judge erred in her designation of Ralph's severe impairments.

However, in setting the residual functional capacity at step 4 of the sequential evaluation process, the administrative law judge rejected the opinions of Dr. Malys and Ms. Basonic.   In doing so, the administrative law judge did not point to any contrary medical opinions.  The record does not contain a physical residual functional capacity assessment of Ralph which takes into consideration all of Ralph's medical records through July, 2012, and  which contradicts the assessments provided by Dr. Malys or Ms. Basonic. The only physical residual functional assessment which suggests that Ralph can engage in full-time work was performed by Dr. Daecher, who is not a cardiologist, and examined Ralph on one occasion on September 3, 2010, regarding chest pain and bilateral knee pain.  Furthermore, the record reveals a decrease in Ralph's cardiac function from January 4, 2011,  when his left ventricular ejection fraction was 61%  to August 7, 2012, when his left ventricular ejection fraction was 50%.  Also, Dr. Daecher's functional assessment was based on an assumption that Ralph only had non-occlusive coronary artery disease.  However, as revealed in the court's review of the medical records, by August, 2012, Ralph had significant occlusive coronary artery disease.[35]

The preference for the treating physician's opinion has been recognized by the Court of Appeals for the Third Circuit and by all of the federal circuits.  See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000).  When the treating physician's

---

[35]Occlusive is defined as pertaining or causing occlusion. Dorland's Illustrated Medical Disctionary, 1311 (32nd Ed. 2012). Occlusion is defined as an obstruction. Id. at 1310.  Ralph had an 80% stenosis or occlusion of the left anterior descending artery (LAD). See Surgery Online, Arterial stenosis or occlusion, https://surgeryonline.wordpress.com/2008/12/20/arterial-stenosis-or-occlusion/ (Last accessed May 8, 2015).

opinion conflicts with a non-treating, non-examining physician's opinion, the administrative law judge may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason." Id.  In choosing to reject the evaluation of a treating physician, an administrative law judge may not make speculative inferences from medical reports and may reject treating physician's opinions outright only on the basis of contradictory medical evidence. Id.  An administrative law judge may not reject a written medical opinion of a treating physician based on his or her own credibility judgments, speculation or lay opinion. Id.  An administrative law judge may not disregard the medical opinion of a treating physician based solely on his or her own "amorphous impressions, gleaned from the record and from his evaluation of the [claimant]'s credibility." Id. As one court has stated, "Judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor" because "lay intuitions about medical phenomena are often wrong." Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir 1990).

In this case, in rejecting the opinions of Dr. Malys, the treating physician, and Ms. Basonic, a treating certified and registered nurse practitioner,[36] the administrative law judge did not point to any contrary medical opinion. The evaluations of Dr. Malys and Ms. Basonic preclude full-time work.  The

---

[36]Dr. Malys is an "acceptable medical source" under the regulations of the Social Security Administration to diagnose medical conditions and render an assessment of a claimant's functional abilities. 28 U.S.C. § 404.1513(a) and (c). Although Ms. Basonic is not an "acceptable medical source, she is an "other source" which must be considered "to show the severity of [a claimant's] impairment(s) and how it affects [the claimant's] ability to work." 28 C.F.R. § 404.1513(d)(1).

administrative law judge engaged in her own lay analysis of the medical records.
This was clear error.

We recognize that the residual functional capacity assessment must be based
on a consideration of all the evidence in the record, including the testimony of the
claimant regarding his activities of daily living,  medical records, lay evidence and
evidence of pain. See Burnett v. Commissioner of Social Sec. Admin., 220 F.3d 112,
121-122 (3d Cir 2000).  However, rarely can a decision be made regarding a
claimant's residual functional capacity without an assessment from a physician
regarding the functional abilities of the claimant. See Doak v. Heckler, 790 F.2d 26,
29 (3d Cir.1986)("No physician suggested that the activity Doak could perform was
consistent with the definition of light work set forth in the regulations, and
therefore the ALJ's conclusion that he could is not supported by substantial
evidence.");  20 C.F.R. § 404.1545(a).

As two commentators have explained:

Sometimes administrative law judges assert that they - and not
physicians - have the right to make residual functional capacity
determinations. In fact, it can reasonably be asserted that the ALJ has
the right to determine whether a claimant can engage in sedentary,
light, medium, or heavy work.  The ALJ should not assume that
physicians know the Social Security Administration's definitions of
those terms. However, the underlying determination is a medical
determination, i.e., that the claimant can lift five, 20, 50, or 100 pounds,
and can stand for 30 minutes, two hours, six hours, or eight hours.
That determination must be made by a doctor. Once the doctor has

> determined how long the claimant can sit, stand or walk, and how much weight the claimant can lift and carry, then the ALJ, with the aid of a vocational expert if necessary, can translate that medical determination into a residual functional capacity determination. Of course, in such a situation a residual functional capacity determination is merely a mechanical determination, because the regulations clearly and explicitly define the various types of work that can be performed by claimants, based upon their physical capacities.

Carolyn A. Kubitschek & Jon C. Dubin, Social Security Disability Law and Procedure in Federal Courts, 287-88 (2011)(emphasis added); see also Woodford v. Apfel, 93 F.Supp.2d 521, 529 (S.D.N.Y. 2000)("An ALJ commits legal error when he makes a residual functional capacity determination based on medical reports that do not specifically explain the scope of claimant's work-related capabilities."); Zorilla v. Chater, 915 F.Supp. 662, 667 (S.D.N.Y. 1996)("The lay evaluation of an ALJ is not sufficient evidence of the claimant's work capacity; an explanation of the claimant's functional capacity from a doctor is required."). The administrative law judge cannot speculate as to a claimant's residual functional capacity but must have medical evidence, and generally a medical opinion regarding the functional capabilities of the claimant, supporting his determination. Id.; see also Yanchick v. Astrue, Civil No. 10-1654, slip op. at 17-19 (M.D.Pa. April 27, 2011)(Muir, J.)(Doc. 11); Coyne v. Astrue, Civil No. 10-1203, slip op. at 8-9 (M.D.Pa. June 7, 2011)(Muir,J.)(Doc. 21); Crayton v. Astrue, Civil No. 10-1265, slip op. at 38-39 (M.D.Pa. September 27, 2011)(Caputo, J.)(Doc. 17); Dutton v. Astrue, Civil No. 10-2594, slip op. at 37-39(M.D.Pa. January 31, 2012)(Munley, J.)(Doc. 14); Gunder v. Astrue, Civil No. 11-300, slip op. at 44-46(M.D.Pa. February 15, 2012)(Conaboy, J.)(Doc. 10).

The error at step four of the sequential evaluation process draws into question the administrative law judge's assessment of the credibility of Ralph. The administrative law judge found that Ralph's medically determinable impairments could reasonably cause Ralph's alleged symptoms but that Ralph's statements concerning the intensity, persistence and limiting effects of those symptoms were not credible. This determination by the administrative law judge was based on an incomplete and faulty analysis of the medical opinions of Dr. Malys and Ms. Basonic.

Furthermore, the administrative law judge failed to adequately develop the record. As noted several times, the administrative record contains medical notes from treating physicians referring to prior medical appointments and ongoing treatment but those records are missing. Finally, The vocational expert who testified at the administrative hearing opined that limitations such as those set by Ms. Basonic and Dr. Malys would preclude an individual from engaging in any type of substantial gainful activity. Tr. 97-99. Consequently, the court cannot conclude that the decision of the administrative law judge finding that Ralph is not disabled is supported by substantial evidence.

The court will, therefore, pursuant to 42 U.S.C. § 405(g) vacate the decision of the Commissioner and remand the case to the Commissioner for further proceedings.[37]

An appropriate order will be entered.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:        May 11, 2015

---

[37]Ralph also argued that the administrative law judge improperly considered certain GAF scores; failed to find at step 3 of the sequential evaluation process that he met the requirement of Listing 12.04 Affective Disorders; and failed to present a hypothetical question to the vocational expert which contained all of Ralph's limitations. In light of the court's disposition of this case, those issues need not be addressed.